IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 1, 2025

IN RE JUANITA M.

Appeal from the Juvenile Court for Dyer County
No. 23-JV-249        Jason L. Hudson, Judge

_____

No. W2025-00822-COA-R3-PT
_____

In this action to terminate parental rights, the mother, father, and child all tested positive for methamphetamine. Accordingly, the Tennessee Department of Children's Services ("DCS") took the child into protective custody, and the child was adjudicated dependent and neglected. Despite completing many of DCS's requirements, the mother and father continued to fail drug tests. DCS filed a petition for termination of parental rights, and the trial court determined that three grounds supported termination as to both parents: (1) persistence of the conditions that led to the child's removal, (2) severe child abuse, and (3) failure to manifest an ability and willingness to assume physical custody of or financial responsibility for the child. The trial court also concluded that termination of both parents' rights was in the child's best interest. Both parents have appealed. Discerning no reversible error, we affirm

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which CARMA DENNIS MCGEE, J., joined. ANDY D. BENNETT, J., filed a separate dissenting opinion.

Angela W. Mueller, Trenton, Tennessee, for the appellant, Angela M.C.

Mark D. Johnston, Dyersburg, Tennessee, for the appellant, Hector M.C.

Jonathan Skrmetti, Attorney General and Reporter, and Jason R. Trautwein, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

OPINION

I. Factual and Procedural Background

This case involves a November 20, 2024 petition to terminate parental rights ("the Termination Petition") filed by DCS in the Dyer County Juvenile Court ("trial court") seeking to terminate the parental rights of Angela M.C. ("Mother") and Hector M.C. ("Father") to their child, Juanita M.C. ("the Child").[1] The Child had been born in October 2020. In the Termination Petition, DCS alleged that clear and convincing evidence supported the following grounds for termination as to both parents: (1) persistence of the conditions that led to the Child's removal, (2) severe child abuse, and (3) failure to manifest an ability and willingness to care for the Child. DCS also alleged that termination as to both parents was in the Child's best interest.

The facts that led to the filing of the Termination Petition are largely undisputed. In November 2023, DCS filed a petition seeking temporary custody of the Child and requesting that the trial court adjudicate the Child dependent and neglected. DCS alleged that caseworker Shimeka Foster had visited the parents' home in response to a "referral of domestic violence, drug exposed child, and environmental neglect." Ms. Foster had "observed the home to be unclean" with "trash, food, and other items covering the living room and kitchen areas." Ms. Foster had also observed that the "stove was pulled out from the wall allowing access for the [C]hild to get behind the stove."

DCS further alleged that both parents had initially refused to submit to drug screens. According to DCS, Mother had been enrolled in Sparo Health, a "suboxone" clinic, and personnel at the clinic had informed DCS that Mother had tested positive for methamphetamine, methadone, and suboxone in August 2023. Mother subsequently tested negative for all substances on October 2, 2023. Father tested positive for amphetamine and methamphetamine on October 6 and 19, 2023. The Child underwent a hair follicle drug screen which returned positive for methamphetamine on October 24, 2023. The parents were each indicted for criminal child neglect in the Dyer County Circuit Court by reason of the Child's exposure to methamphetamine.

On November 3, 2023, the trial court entered an *ex parte* order granting temporary custody of the Child to DCS after finding probable cause that the Child was dependent and neglected based upon the facts alleged in the petition. DCS then placed the Child into the care of the foster mother ("Foster Mother") and her husband (collectively, "Foster Parents"). The Child resided with Foster Parents continuously thereafter. On the date of removal, both parents signed a Criteria and Procedures for Termination of Parental Rights ("Criteria and Procedures") document indicating that they had received a copy of the document and that its contents had been explained to them. The Criteria and Procedures document is a standard form created by DCS that is given to parents whose children have

---

[1] In the Termination Petition and many of the pleadings before the trial court, the Child's name was incorrectly spelled, "Junita." This appeal was also filed using the incorrect spelling of the Child's name. However, the Child's name appears as "Juanita" on her birth certificate, and we have accordingly amended the style of the appeal to reflect the correct spelling.

been placed in foster care. The document was provided to Mother and Father in English, and testimony at trial revealed that DCS did not provide Father, whose primary language is Spanish, with an interpreter to explain the document.

On November 15, 2023, the trial court entered an order appointing counsel for Mother and Father. On November 27, 2023, DCS conducted a meeting with Mother and Father for the purpose of creating and agreeing to a permanency plan with the stated goal of reunification. The permanency plan required Mother to participate in "homemaker services" provided by DCS, to participate in an alcohol and drug assessment ("A&D Assessment"), to follow recommendations from the A&D Assessment, to submit to drug screens and consistently test negative, and to attend "weekly outpatient therapy" as needed. The plan required Father to also complete an A&D Assessment, to follow its recommendations, and to submit to drug screens and test negative each time. DCS did not provide Father with a Spanish interpreter to explain the goals of the permanency plan or Father's responsibilities thereunder.

On February 5, 2024, Father tested positive on a hair follicle drug screen for methamphetamine, and Mother tested negative for all substances. On February 23, 2024, the Dyer County Juvenile Court Foster Care Review Board ("the Board") reviewed the parents' progress on the permanency plan and determined that Mother and Father had each complied with his or her respective "significant responsibilities" and that DCS had made "reasonable efforts" toward reunification. The trial court subsequently conducted a hearing on February 29, 2024, during which the court ratified the November 27, 2023 permanency plan and set a child support obligation for each parent at $100.00 per month.

On May 1, 2024, following a hearing, the trial court entered an order adjudicating the Child dependent and neglected. The order included the following relevant findings:

> Upon hearing the evidence presented on this date, the Court finds that there is clear and convincing evidence that the minor child is dependent and neglected due to drug exposure by the parents; the Court specifically finds that [Mother, Father, and the Child] were all 3 positive for methamphetamine and that the child was under the care and control of the parents during the time she tested positive for methamphetamine.
>
> [DCS] requested to reserve the issue of severe abuse in this matter due to the progress of the parents with services at this time, but the Court would note that it specifically finds the child was positive for methamphetamine while in the care and control of the parents who were also positive for methamphetamine.

(Paragraph numbering omitted.) The trial court set the matter for dispositional hearing on June 14, 2024.

On June 26, 2024, the trial court entered an order determining that the Child should remain in DCS custody and setting a hearing date in August 2024 for ratification of a second permanency plan. DCS implemented the second permanency plan on July 25, 2024, setting forth continued responsibilities for both Mother and Father, including completion of A&D assessments, submission to random drug screens, and participation in recommended programs. The record indicates that Father, Mother, and counsel for Mother were present during the creation of the permanency plan. DCS did not provide Father with a Spanish interpreter to assist in Father's understanding of the second permanency plan.

On August 20, 2024, the Board conducted a second review of the parents' progress relative to the permanency plan. Mother and Father were represented by counsel via Zoom during the Board review. The Board noted that Mother and Father had both completed "intensive out-patient counseling," A&D assessments, and parenting classes. The Board concluded that Mother had complied with her responsibilities under the permanency plan but that Father had not. Specifically, the Board observed that Mother was "actively participating" in the drug screen requirement but that Father was "not compliant" with the drug screening. The Board expressed "major concerns with [Father's] continued failure of drug screens" and additionally noted that there had been "no forward movement" toward reuniting the Child with the parents due to "[Father's] failure to comply with passing drug screens." The Board found that DCS had made reasonable efforts to assist the parents in reaching the goals set forth in the permanency plan and recommended that DCS "look for relative placement, move toward [Termination of Parental Rights] and adoption." The trial court ratified the permanency plan in an order entered on October 2, 2024.

On September 13, 2024, Mother tested positive for methamphetamine on a hair follicle drug test. On December 10, 2024, Mother pled guilty to criminal child neglect based on the indictment that had been brought against her shortly after the Child's removal. Father's criminal charges of child neglect remained pending. DCS filed the Termination Petition on November 20, 2024. The Board conducted another review of the parents' progress relative to the second permanency plan on February 27, 2025. Mother and counsel for Father attended the Board review meeting via Zoom. The Board again concluded that Mother had complied with her most significant responsibilities in the permanency plan, but that Father had not complied with the drug screening requirements. The Board also noted that DCS had made reasonable efforts to assist the parents in reaching the goals set forth in the permanency plan. The Board recommended that DCS "move forward" in seeking termination of parental rights and adoption.

On May 9, 2025, the trial court conducted a hearing relative to the Termination Petition. The trial court heard testimony from Mother; Father; Foster Mother; and DCS caseworkers, Shimeka Foster and Loretta O'Neill. On May 23, 2025, the trial court entered an order terminating Mother's and Father's parental rights to the Child. The trial court determined, by clear and convincing evidence, that three statutory grounds supported

termination as to both parents: (1) persistence of the conditions that led to the Child's removal, (2) severe child abuse, and (3) failure to manifest an ability and willingness to assume physical custody of or financial responsibility for the Child. The trial court also determined that termination of Mother's and Father's parental rights was in the Child's best interest. Mother and Father timely appealed.

## II. Issues Presented

Mother has raised the following issues on appeal, which we have restated and reordered as follows:

1.      Whether the trial court erred in finding, by clear and convincing evidence, that the conditions leading to the removal of the Child from Mother's custody persisted.

2.      Whether the trial court erred in finding, by clear and convincing evidence, that Mother had failed to manifest an ability and willingness to assume physical custody of or financial responsibility for the Child.

3.      Whether the trial court erred in finding, by clear and convincing evidence, that termination of Mother's parental rights was in the Child's best interest.

Father has raised the following additional issues, which we have also restated and reordered as follows:

4.      Whether the trial court erred in finding, by clear and convincing evidence, that the ground of severe child abuse had been established as to Father.

5.      Whether the trial court erred in determining, by clear and convincing evidence, that the grounds of persistent conditions and failure to manifest an ability and willingness to care for the Child had been established in support of termination of Father's parental rights when DCS had purportedly failed to make reasonable efforts to assist Father relative to these grounds.

6.      Whether the trial court failed to properly consider the failure of DCS to make reasonable efforts to provide translators or other reasonable methods of communication to Father when Father's primary language was Spanish and he had limited communication skills in English.

7.      Whether the trial court erred in failing to properly consider all relevant and child-centered factors applicable to this case in its best interest analysis.

## III.  Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).  The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings.  *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530.  Questions of law, however, are reviewed *de novo* with no presumption of correctness.  *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).  The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary.  *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002).  It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)).  As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)].  Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable").  In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769.  This standard minimizes the risk of

unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

* * *

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV. Statutory Grounds for Termination of Parental Rights

Tennessee Code Annotated § 36-1-113 (West July 1, 2021, to current)[2] lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

___

[2] Unless otherwise noted, throughout this Opinion, all citations to any section within Tennessee Code Annotated §§ 36-1-113 and 36-1-102 shall be made in reference to the version that was effective on the date the Termination Petition was filed and not to any other version of the statute. *See, e.g.*, *In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *4, n.6 (Tenn. Ct. App. Aug. 5, 2023). In some instances, such as this one, the section that was in effect at the time the Termination Petition was filed has not changed and therefore remains current.

\* \* \*

(c)    Termination of parental or guardianship rights must be based upon:

    (1)    A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

    (2)    That termination of the parent's or guardian's rights is in the best interests of the child.

As delineated above, the trial court concluded that the evidence clearly and convincingly supported three statutory grounds to terminate Mother's and Father's parental rights: (1) persistence of the conditions that led to the Child's removal from the parents' custody, (2) severe child abuse, and (3) failure to manifest an ability and willingness to assume physical custody of or financial responsibility for the Child. We will address each statutory ground in turn.

## A. Persistence of Conditions

Tennessee Code Annotated § 36-1-113(g)(3) provides for termination of parental rights when:

    (A)    The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

        (i)    The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

        (ii)    There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

        (iii)    The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B)     The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

To terminate parental rights under this ground, a court must find that each of the foregoing elements was proven by clear and convincing evidence. *In re B.A.C.*, 317 S.W.3d 718, 725 (Tenn. Ct. App. 2009).

In the instant case, the trial court summarized its findings regarding persistence of conditions as follows:

[C]lear and convincing evidence established that [Mother] and [Father] failed to remedy the persistent conditions, which barred reunification with the child.

The child was removed from the custody of the parents on November 3, 2023, and it has been more than 6 months since the removal of the child from the parents. Environmental concerns and drug use were the reasons for the removal of the child from the custody of Mother and Father. Initially the environmental concerns were addressed, and may still be addressed; however, no one has been in the parents' home in some time despite efforts to visit the home by [DCS]. Mother pled guilty and admitted even that she had exposed the child to methamphetamine. There has been no change in 18 months for the parents. The parents have failed drug screens throughout the case, and have not gone for 6 consecutive months without failing a drug screen. The use of methamphetamine has not been eradicated from the home.

The conditions that led to the removal of this child still exist and other conditions exist in the homes of the parents that, in all reasonable probability, would lead to further neglect or abuse of the child. There is little chance that these conditions will be remedied soon so that the child can be returned safely to the custody of either parent, and continuation of the parent/child relationship greatly diminishes the child's chances of being placed into a safe, stable and permanent home. Based on the evidence, this Court finds that clear and convincing evidence has been established that [Mother] and [Father] have not remedied the persistent conditions that prevent reunification with the child.

Regarding the condition of the parents' home, DCS caseworker, Ms. O'Neill, testified that the parents had moved residences and had "worked the [homemaker] services" to the satisfaction of the homemaker service facilitator, Judy Gurien, and that Ms. Gurien had reported that the parents' new home environment had improved. However, the record demonstrates that Mother and Father had not allowed DCS to enter their home since

October 2024 such that there was no evidence between October 2024 and May 2025 that the home remained in good condition. To this point, Ms. O'Neill testified that she had attempted to visit the parents' home "probably six times" since October 2024, and again on the morning of the trial, but that she had not been granted access. Despite these concerns, this Court has determined that a "record 'devoid of proof'" about a parent's home environment or other conditions does not suffice to prove the ground of persistent conditions by clear and convincing evidence. *See In re Evandor C.*, No. M2022-01697-COA-R3-PT, 2024 WL 678014, at *12 (Tenn. Ct. App. Feb. 20, 2024). This is so even if the lack of proof is due to the parents' failure to cooperate. *See id.* We therefore conclude that the evidence, as it specifically relates to the environmental conditions of the parents' home, was insufficient to prove the ground of persistence of conditions.

As this ground relates to Father's conduct, the evidence of his continued drug use following removal of the Child does preponderate in favor of the trial court's findings. After the Child was removed into DCS custody, Father did not comply with the drug screen requirements set forth in the permanency plans and continued to test positive for methamphetamine. This included testing positive on February 21, 2025, just three months before the termination trial. We find that Father's continued drug use throughout the proceedings indicates that (1) return of the Child into Father's custody would have placed the Child at risk of substantial harm, (2) there was little likelihood that Father's drug use would be remedied at an early date such that the Child could be safely returned to him in the near future, and (3) continuation of the relationship between Father and the Child would greatly diminish the Child's opportunity to be placed in a safe and stable home. Each element of this statutory ground, as it pertains to Father, has been met. *See* § 36-1-113(g)(3)(A)(i)-(iii). Accordingly, we affirm the trial court's determination that clear and convincing evidence supported this ground for termination of Father's parental rights to the Child.

The analysis is more difficult with respect to Mother. Although Mother tested positive for methamphetamine on September 13, 2024, she later tested negative for any illicit substances in January 2025. Mother did not report for a drug screen in February 2025, but this was because she had been incarcerated on the child neglect charges that had been brought against her in 2023. During the intervening months, the Board repeatedly noted that Mother had been making progress toward the permanency plan goals and that she had substantially complied with plan requirements.

However, despite Mother's commendable efforts to discontinue her drug use and the evidence that she had made some improvements in this regard, Mother continued to live with Father—an active drug user—until the termination trial. Mother did not indicate any plan to extricate herself from her relationship with Father or to move to a different residence so that she could eventually be reunited with the Child in a drug-free home. Thus, returning the Child to Mother's custody would put the Child at risk of substantial harm and would diminish the Child's chances for early integration into a safe and stable home for

the same reasons that returning the Child to Father's custody would do so. As noted above, Father's continued drug use appeared unlikely to improve such that the Child could be safely restored to his custody in the future, and the same was true for Mother as long as Mother continued to reside with Father. For these reasons, we find clear and convincing evidence supports the trial court's determination that this ground had been established as to Mother as well as to Father.

### B. Severe Child Abuse

The trial court concluded that the evidence clearly and convincingly demonstrated that Mother and Father had committed severe child abuse against the Child by exposing the Child to methamphetamine. The version of Tennessee Code Annotated § 36-1-113(g)(4) (West July 1, 2024, to June 30, 2025) that was in effect at the time the Termination Petition was filed provided that this ground had been proven when:

> Under a prior order of a court or by the court hearing the petition to terminate parental rights or the petition for adoption, a child has been found to be a victim of severe child abuse, as defined in § 37-1-102, and the parent or guardian has been found to have knowingly or with gross negligence either committed severe child abuse or failed to protect the child from severe child abuse.

At the time the Termination Petition was filed, § 37-1-102(b)(27)(E) (West July 1, 2024, to December 31, 2024) included the following definition of "severe child abuse":

> The ingestion of an illegal substance or a controlled substance by a child under eight (8) years of age that results in the child testing positive on a drug screen[.]

Here, the trial court found that clear and convincing evidence supported termination of Mother's and Father's parental rights relative to this ground, stating:

> Pursuant to Tenn. Code Ann. § 36-1-113(g)(4) and 37-1-102(b)(27)(E), there is clear and convincing evidence that [Mother] and [Father] have committed severe child abuse as defined in TCA § 37-1-102(b)(27)(E).
>
> * * *
>
> [T]he evidence as presented today shows that [Mother] and [Father] have both committed severe abuse against the child pursuant to TCA § 37-1-102(b)(27)(E) as evidenced [by proof of positive drug screens from Father, Mother, and the Child] along with the certified guilty plea of Mother[].

- 11 -

According to the testimony of Shimeka Foster, the testimony of the Mother and Father, and a review of the exhibits consisting of the hair follicle results of the child, the mother and the father, the Court specifically finds: that the child was under the age of 8 at the time she was exposed to and tested positive for methamphetamine on her hair screen, in fact the child was 3 years old at the time; that the Mother and Father both testified they were using drugs, specifically methamphetamine, at that time; and all three failed hair follicle drug screens for methamphetamine. Further, Mother testified that the child was in her care 100% of the time and if not with her then the child was only with the Father. The parents knowingly and recklessly exposed this child to their methamphetamine use, shown both through the drug screen results for the parties and based on Mother's admission in pleading guilty. Based on these facts, this ground has been met [by] clear and convincing evidence.

The undisputed evidence in the record supports the trial court's determination that this ground was established by clear and convincing evidence as to both parents. The Child tested positive for methamphetamine in October 2023. Prior to that drug test, the Child had been under the exclusive care and control of Mother and Father. On May 1, 2024, the trial court found clear and convincing evidence that the Child was "dependent and neglected due to drug exposure by the parents," specifically finding that Mother, Father, and the Child "were all 3 positive for methamphetamine and that the [C]hild was under the care and control of the parents during the time she tested positive for methamphetamine." Significantly, neither Mother nor Father raised any objection to these findings in the proceedings below. Neither appellant disputes that Father, Mother, and the Child all tested positive for methamphetamine while all three were residing together.

On appeal, Father asserts that this Court should reverse the trial court's findings as this ground relates to him because "there is nothing in the record that would establish drug use by the Father in the presence of the [C]hild" and "there is nothing in the record that would establish a reason for the Father to know of the potential for any drug use by the mother around the Child." Thus, according to Father, he did not "knowingly" expose the Child to methamphetamine. However, "a parent's failure to protect can be considered knowing if the parent was deliberately ignorant, as where the parent avoids actual knowledge of the abuse or neglect but is aware of facts, circumstances, or information that would put a reasonable parent on notice of the risk and the need to protect the child." *See In re Markus E.*, 671 S.W.3d 437, 463 (Tenn. 2023). Here, there is one glaringly obvious reason that Father should have known that the Child was at risk of severe child abuse from exposure to methamphetamine, and that is that Father himself had been using methamphetamine while living with the Child. Furthermore, the record established that Mother had been going to a suboxone clinic prior to the Child's removal because of her addiction to methamphetamine, and Father, who resided with Mother, should have been aware of these facts and circumstances.

Moreover, this Court has determined that it is not the "method or level of exposure of the child to drugs" upon which the determination of severe child abuse turns, but rather it is "the exposure of the child to harm that matters[.]" *See In re A.L.H.*, No. M2016-01574-COA-R3-JV, 2017 WL 3822901, at *4 (Tenn. Ct. App. Aug. 31, 2017). Indeed, "[t]his Court has repeatedly held that exposure of a child to drugs constitutes severe child abuse." *See id.*; *see, e.g.*, *In re Ezmaie F.*, No. M2023-01731-COA-R3-PT, 2024 WL 5183675, at *7 (Tenn. Ct. App. Dec. 20, 2024) (affirming a finding of severe child abuse when the parents' two children had tested positive for methamphetamine and other drugs and determining that "each parent was, at minimum, grossly negligent in allowing each child to ingest an illegal substance"); *In re Kailey A.*, No. E2021-00801-COA-R3-PT, 2022 WL 773617, at *10 (Tenn. Ct. App. Mar. 14, 2022) (finding by clear and convincing evidence that the mother had severely abused her children based on "their exposure to methamphetamine in the family home as shown by, among other things, their subsequent drug test results being positive for methamphetamine").

The Child's October 2023 positive hair follicle drug test definitively proved that the Child had been exposed to methamphetamine while in Mother's and Father's exclusive care. Neither Mother nor Father deny that they each used methamphetamine during the time when they both resided with the Child or that the Child was exposed to methamphetamine while in their care. Whether it was Mother or Father who exposed the Child to methamphetamine, and whether each knew of the other's drug use, is of no import. The controlling determination is that while the Child was in the exclusive care of Mother and Father, both parents failed to protect the Child from exposure to drugs. *See In re A.L.H.*, 2017 WL 3822901, at *4. Therefore, Father's arguments concerning this ground are unavailing, and we affirm the trial court's determination that this ground was established by clear and convincing evidence as to both parents.

### C. Failure to Manifest an Ability and Willingness to Assume Legal and Physical Custody of or Financial Responsibility for the Child

The trial court also determined that Mother and Father had failed to manifest an ability and willingness to assume custody of or financial responsibility for the Child. Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(14) provides for termination of parental rights when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

To prove this ground, DCS was required to show, by clear and convincing evidence, that (1) Mother and Father failed to manifest either an ability or willingness to assume custody

- 13 -

of or financial responsibility for the Child and (2) returning the Child to Mother's or Father's custody would pose a risk of substantial harm to the Child's welfare. *In re Neveah M.*, 614 S.W.3d 659, 674, 677 (Tenn. 2020); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *6 (Tenn. Ct. App. Apr. 23, 2020) ("Under this ground for termination, the petitioner must prove each element by clear and convincing evidence.").

As to the first prong, our Supreme Court has instructed:

> [S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*In re Neveah M.*, 614 S.W.3d at 677 (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). Concerning the "substantial harm" requirement of the second prong, this Court has observed:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted in *Maya R.*)).

In the instant action, the trial court articulated the following relative to this ground:

> Pursuant to Tenn. Code Ann. § 36-1-113(g)(14), clear and convincing evidence has established that [Mother] and [Father] have failed to manifest an ability and willingness to care for the child and placing the child in either of their custody would pose a substantial harm to the child. There are two parts to the analysis of this ground which will be addressed below.

> This matter began approximately 18 months ago with drug use by the parents which resulted in the child testing positive for methamphetamine. [DCS] offered services to the parents, and whether it was enough is

- 14 -

debatable, but the fact is that the parents continue to have positive drug screens after participating in the services offered. If drug use is still there, then the parents are not manifesting an ability and willingness to assume custody or care for the child in any manner. This child was positive for methamphetamine at 3 years old. The Court is not a scientist and does not know all medical effects of exposure to methamphetamine. If we assume that was the first exposure, then maybe there will not be long term effects, but we do not know that it was the first exposure, especially considering that the parents still have not passed consecutive drug screens. Both parents were charged with child abuse and neglect; Mother has entered a plea and has been sentenced while Father has a hearing date in September. Drug screens have been failed by both parents throughout this case, with neither passing consecutive drug screens for even a period of 6 months. This continued drug use has prevented the parents from assuming legal and physical custody or financial responsibility for the child.

Placing the child in either Mother or Father's custody would pose a risk of substantial harm to the physical or psychological welfare of the child. The parents continue to engage in drug use. Mother was just released from jail for child abuse and neglect in April of 2025. Father has pending criminal charges for child abuse and neglect. There is a history of drug use by both parents. All of these behaviors exhibited by the parents pose a risk of substantial harm to the child, and there is no indication that these behaviors would cease as they have not ceased in the 18 months the child has been in foster care. The Court concludes that there is clear and convincing evidence that [Mother] and [Father] have failed to manifest an ability and willingness to assume custody of the child pursuant to Tenn. Code Ann. § 36-1-113(g).

The evidence supporting termination discussed above pursuant to the grounds of persistent conditions and severe child abuse also supports termination relative to this statutory ground. After the Child was removed and placed into DCS custody in November 2023, both Mother and Father continued to test positive for methamphetamine, with Mother's latest positive test result in September 2024 and Father's most recent positive screen in February 2025. This demonstrates that neither parent was willing or able to take the necessary steps to cease using drugs so that he or she could assume physical custody of the Child. We acknowledge that Mother had made progress toward conquering her drug addiction, as demonstrated by her occasional ability to return a clean drug screen. However, Mother had not demonstrated consistency in ending her drug use during the entirety of the proceedings. Even more troubling, Mother continued to reside with Father, who was proven to be actively using methamphetamine just three months before the termination trial.

Mother's and Father's continued drug use also supports termination as to the second

- 15 -

prong of this ground because return of the Child to the parents would pose a risk of substantial harm to the Child. Furthermore, the Child had resided with Foster Mother and her family for eighteen months by the time of the termination trial, during which time the Child had bonded with the Foster Parents. This Court has previously determined that removing a child who has "bonded and thrived" with her current family amounts to substantial harm. *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020) (finding that the child would be at risk of substantial psychological harm if custody were restored to the father who had been apart from the child for five years and was a "virtual stranger"); *In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *9 (Tenn. Ct. App. Nov. 25, 2019) (concluding that placing the children in the mother's custody would put them at risk of substantial harm because the children were "very young" when they were removed and had "little to no contact" with the mother for more than a year).

The Child had come to live with Foster Parents at the age of three. At trial, Foster Mother testified that the Child was "thriving," with her foster family and that she was "in daycare," playing "t-ball," and "very active with the church." Foster Mother further articulated that the Child had "bonded" with the Foster Parents' infant child and that she got along "great" with both Foster Parents, actively participating in family events. Ms. O'Neill testified that the Child had exhibited a "healthy parental attachment" to Foster Parents and that their home was a "safe, secure environment" for the Child. By contrast, Ms. O'Neill testified that the Child referred to Mother and Father by "their first names" such that the Child did not appear to consider them parental figures. For the above-stated reasons, we affirm the trial court's conclusion that both prongs of this ground were established by clear and convincing evidence as to both parents.

## V. Best Interest of the Child

When, as here, a parent has been deemed unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i)(1) (West July 1, 2021, to current) lists the following factors for consideration:

(A)     The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)     Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)     Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E)     Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)     Whether the child is fearful of living in the parent's home;

(G)     Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)     Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance

analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statute further provides: "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(g)(i)(2).

As our Supreme Court has instructed regarding the best interest analysis:

These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must

- 19 -

consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In the case at bar, the trial court considered each of the best interest factors and determined that several of them weighed in favor of terminating Mother's and Father's parental rights. The trial court then concluded, by clear and convincing evidence, that termination of Mother's and Father's parental rights was in the Child's best interest.

The trial court weighed factor (A)—the effect termination will have on the child's critical need for stability and continuity of placement—in favor of termination, noting that there "has continued to be drug use in the parents' home, which does not give rise to stability." The court also weighed factor (B)—the effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition—in favor of termination, noting that the Child had "thrived over the last 18 months with the foster family" and that when she came into DCS custody, the child "was bruised, thin, dirty and hungry" but that those characteristics were no longer present. For the reasons stated above relative to all three statutory grounds for termination, we agree with the trial court that factors (A) and (B) weigh in favor of termination as to both parents.

The trial court determined that factor (C), which considers whether the parent has demonstrated continuity and stability in meeting the child's basic needs, weighed in favor of termination as to both parents. The court noted that although the parents had "made changes to the home environment," they had not been able to present "a drug free home" and that this constituted a "safety issue." The parents continued to live together throughout the proceedings. Mother tested positive for methamphetamine eight months before trial, and Father tested positive for methamphetamine a mere three months before trial. The evidence preponderates in favor of the trial court's determination.

The trial court weighed both factors (D) and (E) against termination. Factor (D) considers whether the parents and child have a secure and healthy parental attachment and if not, whether there is a reasonable expectation that the parent can create such attachment. Factor (E) considers whether the parent has maintained regular visitation or other contact with the Child. In weighing these factors against termination, the trial court noted that the parents had "maintained regular supervised contact and visitation" with the Child throughout the proceedings. Regarding factor (E), we agree that this factor weighs against termination. The parents consistently visited with the Child, even reaching out with Foster Mother's consent and assistance to speak to the Child outside of their regularly scheduled supervised visits. Both parents appear to have fostered and maintained a positive relationship with the Child.

However, we disagree with the trial court as to factor (D). Since the Child was placed into DCS custody, Mother and Father had enjoyed only supervised visits with the Child for four hours per week plus occasional video calls facilitated by Foster Mother. According to Ms. O'Neill, the Child did not refer to Mother and Father as her parents during the visits but instead called them by their first names. By contrast, the Child referred to her Foster Parents as "mom and dad." Although the parents' efforts to visit the Child regularly are commendable and they clearly maintained a positive relationship with the Child, there was no evidence that the Child had developed a "secure and healthy <u>parental</u> attachment" to Mother and Father. Moreover, the parents' continued drug use cuts against any reasonable expectation that the parents could create such an attachment in the near future. Therefore, Factor (D) weighs in favor of termination. By virtue of the bond between the Child and Foster Parents, we also agree with the trial court that factor (H)— whether the Child has created a healthy parental attachment with another person or persons—weighs in favor of termination.

The trial court determined that factors (F) and (G) weighed neutrally because there had been no evidence presented about whether the Child was fearful of living in the parents' home. The record is consistent with the trial court's determination, and we will not disturb its findings regarding these factors.

With respect to factor (I)—whether the child has emotionally significant relationships with persons other than parents and caregivers and how these relationships affect the child's access to information about the child's heritage—the trial court weighed this factor in favor of termination, reiterating the Child's growing parental attachment to Foster Parents. Regarding the Child's access to her family heritage, there was no evidence presented about Mother's family except Mother's testimony that she had family in the area but did not "talk to them that much."

As to Father's cultural heritage, Father and Foster Mother testified that Father and the Child would communicate in Spanish during their video calls. Father expressed a desire for the Child to learn "Spanish tradition and culture" and "the Spanish language." We are sensitive to the fact that if the Child loses access to Father's family, there would possibly be aspects of Father's Mexican heritage that may be lost to the Child. However, Father's closest family resided in Colorado at the time of trial, and there was no evidence that Father maintained a close relationship with those family members such that the Child would necessarily have access to her heritage through them. Regarding the Child's exposure to the Spanish language, Foster Mother testified that Foster Parents had "engaged a tutor" to teach the Child Spanish and to "preserve her culture." Such action on the part of Foster Parents indicated their intention to help the Child know about her family of origin and heritage. The evidence preponderates in favor of the trial court's findings regarding factor (I).

As to factor (J), the trial court stated:

Factor (J) is this case in a nutshell. These parents have not demonstrated a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent. There continues to be the use of controlled substances, namely methamphetamine, which renders the parents unable to consistently care for the child in a safe and stable manner. The parents have not shown that they are able to remain drug free in this matter. This factor weighs in favor of termination.

Upon careful review, and for the reasons stated above relative to all three statutory grounds for termination, we agree with the trial court's conclusions respecting factor (J).

Turning to factor (K), which considers whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions, the trial court weighed this factor in favor of termination. The trial court reasoned that although the parents "did take advantage of services offered to them,[] they made no lasting adjustment and were unsuccessful in implementing and demonstrating the skills learned." The trial court stated that the parents had "completed [A&D] assessments and did 1-2 months of IOP services" but then failed hair follicle drug screens.

As factor (K) pertains to Mother, it is undeniable that Mother worked with DCS to improve her circumstances and that she took steps to overcome her drug habit so that she could be reunited with the Child. The most detailed evidence of Mother's progress toward reunification can be found in the three foster care Board review reports. All three of the Board reports stated that Mother had complied with her most significant responsibilities in the permanency plan. In the February 23, 2024 report, the Board commended mother in "actively pursuing" her action steps. In the August 20, 2024 report, the Board wrote to Mother: "Keep up the good work!" In the February 27, 2025 report, which occurred shortly after Mother tested positive once again for methamphetamine, the Board encouraged Mother to "focus on her sobriety" and to seek legal counsel regarding steps she could take to "increase her chances of reunification" with the Child. Additionally, Mother consistently reported for drug screens following removal of the Child, regularly attended supervised visitation, completed an IOP, and completed homemaker services. It is unfortunate that Mother's efforts to improve her life were hampered by her inability to end her unlawful drug use or to extract herself from Father's influence. However, it would be inaccurate to state that Mother did not avail herself of the services offered by DCS or that she did not try. Factor (K) weighs against termination as to Mother.

Father made fewer efforts toward improving his circumstances. The latter two of three Board reports concluded that Father had failed to comply with his most significant responsibilities in the permanency plan. Father tested positive for methamphetamine on

February 5, 2024, and February 21, 2025. Father has raised on appeal that he was not provided a Spanish interpreter by DCS and that this caused him to misunderstand what was required of him. We will address that important issue in more detail in a subsequent section of this Opinion. However, considering Father's purported language barrier, we find Father's argument that he did not understand what was required of him by DCS disingenuous as it relates to his continued drug use. Father admitted during trial that after he had tested positive for methamphetamine, DCS had offered him assistance in addressing his drug use and that he refused that assistance:

> Attorney: You understand part of what you were asked to do were some drug screens in [February 2024 and February 2025]. You submitted to those and failed them, didn't you.
>
> Father: Here is my point. After those drug tests, we had a video chat meeting. It was a phone call maybe. It is what they asked me if I needed help in that matter or was it something I would be able to address on my own. I told them I could do it by myself but from [February 2025] until here, there has been no more drug tests, no contact, no nothing.

When questioned about the failed drug screens again later during his testimony, the following interaction ensued:

> Attorney: [W]ere you using methamphetamine during that time period [between February 2024 and February 2025] when you failed tests for it?
>
> Father: When I failed the drug test, yes, that's why I failed it. . . . Right after that one time over the phone when I told them I would be able to get clean and help on my own, from then on if you were to give me a test now, I will do it right now, clean.

These exchanges demonstrate that Father understood that he had failed a drug screen, that he further understood that getting "clean" was the desirable outcome, and that DCS was offering him assistance to address his unlawful drug use. By Father's own admission, he had declined DCS's offer of assistance because he had intended to "get clean and help on [his] own." Thus, Father intentionally and knowingly refused to avail himself of DCS's services on the paramount issue relative to his termination case: his continued drug use. We agree with the trial court that Factor (K) weighs in favor of termination as to Father.

Moving to factor (N), which considers whether the parent or any other person in the parent's home has shown brutality or any other form of abuse or neglect toward the child or any other child, the trial court simply stated that the parents had "shown neglect" toward

the Child as evinced by the Child "testing positive" for methamphetamine "at 3 years old" and the parents' "continued failure of drug screens over a period of 18 months." For the reasons articulated above relative to the ground of severe child abuse, we agree that this factor weighs in favor of termination as to both parents.

The trial court found that factor (O)—whether the parent has ever provided safe and stable care for the child or any other child—weighed in favor of termination for both parents as well. The trial court noted that at the time the Child was placed into foster care in November of 2023, the Child had "presented as dirty, bruised, thin, and hungry"; she had recently "tested positive for methamphetamine on a hair follicle drug test"; the parents' home had been "dirty, there was trash all around; clutter, water standing on the floor, old food on the counters and surfaces, the refrigerator did not work, there was garbage in the rooms"; and "there was no bed for the Child." We additionally note that Mother testified to having two children other than the Child, one of whom was with the child's maternal grandmother and the other, Mother's "second son," had been "adopted out" due in part to Mother's use of methamphetamine. Mother had been living with Father when her second son was adopted due to Mother's drug use. The evidence in the record supports the trial court's conclusion that factor (O) weighed in favor of termination as to both parents.

The trial court determined that there was "no proof presented" respective of factor (P), which concerns whether the parents have demonstrated understanding of the basic and specific needs required for the child to thrive, or factor (Q), which considers whether the parent had demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive. The trial court declined to weigh either factor for or against termination. However, we find it quite apparent that Mother and Father, who both tested positive for methamphetamine during the proceedings, failed to demonstrate, by their continued drug use alone, a basic understanding of or an ability and commitment to creating and maintaining a home that would meet the basic and specific needs of the Child. A child cannot thrive in a home wherein one parent, and certainly both parents, are using methamphetamine. Factors (P) and (Q) weigh in favor of termination. For the same reasons, we agree with the trial court that factor (R)—whether the physical environment of the parent's home is healthy and safe for the child—also weighs in favor of termination.

As to factor (S), whether the parent has consistently provided more than token financial support for the child, the trial court weighed this factor against termination as to Father, noting that he had "provided consistent child support payments" for the Child. The evidence preponderates in favor of the trial court's determination as to Father. With respect to Mother, the trial court stated there was "no proof presented as to Mother for child support" and determined the factor did not weigh in favor of termination as to Mother. Although we agree with the trial court's ultimate conclusion, we note that the record does include some proof respective of Mother's child support obligation. Beginning in November 2023, the permanency plans required that Mother pay $100.00 per month for

the financial support of the Child. The trial court reiterated the child support requirement when it ratified the permanency plans in February and October 2024 and included in each ratification order an instruction that both parents should pay their respective child support obligations directly to the "State Disbursement Unit." In June 2024, DCS filed a petition for contempt against Mother, alleging that she had failed to make any payment toward her child support obligation and seeking an arrearage of $300.00. Attached to the petition was a notice of civil contempt signed by a child support enforcement officer. However, it is unclear how or whether Mother's alleged child support arrearage or the petition for contempt was resolved. We therefore find that the proof regarding Mother's child support obligation is insufficient to weigh this factor either for or against termination, and we agree with the trial court that it weighs neutrally as to Mother.

Factor (T) considers whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child. The trial court weighed this factor in favor of termination of both Mother's and Father's parental rights predicated on the "impact their continued drug use has on the child," which the court found to be "significant." The parents' continued drug use was proven, *inter alia*, by the positive drug screens and the admission of the parents under oath. For the same reasons that we weighed factors (P) and (Q) in favor of termination, factor (T) also weighs in favor of termination as to both parents.

Concerning factor (L)—whether DCS has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department, the trial court determined:

> [DCS] did make reasonable efforts to assist the parents. Could [DCS] have done more, possibly. However, the parents did not successfully engage in the services offered as evidenced by their continued use of drugs. This factor weighs in favor of termination.

On appeal, Father asserts that DCS failed to make reasonable efforts to help him reunite with the Child in two main areas: (1) failure to provide adequate "assistance and support" in helping Father "overcome allegations of drug abuse or addiction" and (2) failure "to provide translators or other reasonable methods of communication" to Father, who "spoke Spanish and had limited communication skills in English." We will address each postulate in turn.

Tennessee Code Annotated § 37-1-166(g), the statute governing dependency and neglect proceedings before a juvenile court, defines "reasonable efforts" as "the exercise of reasonable care and diligence by [DCS] to provide services related to meeting the needs of the child and the family." DCS bears the burden to demonstrate that reasonable efforts have been made to either "(1) prevent the need for removal of the child from such child's

- 25 -

family; or (2) make it possible for the child to return home." *See* Tenn. Code Ann. § 37-1-166(a) and (b). In determining what constitutes "reasonable efforts," the statute instructs that "the child's health and safety shall be the paramount concern." *See* § 37-1-166(g).

Regarding the "reasonable efforts" requirement in the context of a parental termination proceeding, our Supreme Court has held that the "extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent." *See In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Thus, "the extent of DCS's efforts remains a factor to be weighed in the best interest analysis, not an essential element that must be proven in order to terminate [parental rights]." *See id.* at 556. In other words, parental rights may still be terminated even if the trial court finds that DCS did not make reasonable efforts toward reunification. *See id.*

However, in so holding, the *In re Kaliyah S.* Court cautioned:

> In many circumstances, the success of a parent's remedial efforts is intertwined with the efforts of the Department's staff to provide assistance and support. Reasonable efforts entail more than simply providing parents with a list of service providers and sending them on their way. The Department's employees must use their superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for assistance or not.

*Id.* at 556 (quoting *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 (Tenn. Ct. App. Mar. 9, 2004)).[3] The Court continued that a lack of reasonable efforts "may weigh heavily enough to persuade the trial court that termination of the parent's rights is not in the best interest of the subject child." *See id.*

Father relies on this excerpt from *In re Kaliyah S.* to argue that his lack of success in passing drug screens was "intertwined with the efforts of [DCS] staff to provide assistance and support." Father asserts that his "stance that he could [end his drug addiction] on his own was not a legitimate reason for DCS to simply ignore the need for more attention to these matters." Father refers here to the fact that after he tested positive for methamphetamine in February 2025, he declined an offer of assistance from DCS to address his drug problem. Father expounds that his refusal of help after this last drug screen was not a "legitimate reason" for DCS to "simply ignore" Father's needs in this area.

---

[3] The Supreme Court overruled *In re C.M.M.* by holding that the State is not required, as a precondition to termination, to prove that it made reasonable efforts to reunify the parent with the child. *See In re Kaliyah S.*, 455 S.W.3d at 535. Nevertheless, the Court quoted this excerpt from *C.M.M.* with approval in an effort to avoid "minimiz[ing] the importance of DCS's efforts to assist parents who lose custody of their child and seek to regain it." *See id.* at 556.

We note that Father has narrowed the focus of his argument to the three-month period between his positive drug screen and the termination trial in May 2025. In so doing, Father ignores the preceding fifteen-month period that included the many documented efforts made by DCS to assist him with his drug problem and other needs. Between November 2023 and February 2025, DCS funded, facilitated, and monitored the parents' participation in homemaker services, parenting assessment services, mental health assessments, alcohol and drug assessments, an online parenting class, and intensive outpatient services. DCS also met with the parents to form two permanency plans, participated in numerous court hearings to ratify and review the parents' progress, and participated in three foster care Board review sessions. DCS caseworker Ms. O'Neill testified that she personally attempted to visit the parents' home "probably six times" in addition to the home visit she attempted, at Mother's request, on the morning of trial.

In the case at bar, DCS clearly did more for Mother and Father than "simply providing parents with a list of service providers and sending them on their way." *See In re Kaliyah S.*, 455 S.W.3d at 556. And although we agree that DCS does bear the responsibility to assist parents with problems like drug addiction and other needs that are identified in a permanency plan, *see id.*, parents also bear responsibility to take advantage of the help offered. *See, e.g.*, *In re Jah'Lila S.*, No. W2021-01199-COA-R3-PT, 2022 WL 4362839, at *13 (Tenn. Ct. App. Sept. 21, 2022) ("Reasonable efforts are not tantamount to Herculean efforts . . . and parents are also required to make reasonable efforts to rehabilitate themselves.") (citations and internal quotation marks omitted); *In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *20 (Tenn. Ct. App. July 15, 2019) ("This court has previously stated that DCS's duty to make reasonable efforts is a two-way street. A parent's response to and cooperation with the Department's reunification efforts is one of the factors to be considered when evaluating the reasonableness of DCS's efforts.") (citation omitted). Father admits that he continued to use methamphetamine during the pendency of the termination proceedings and that when DCS asked him if he required assistance with his drug addiction, he declined that help. Father did not make reasonable efforts to rehabilitate himself. *See In re Jah'Lila S.*, 2022 WL 4362839, at *13.

As the trial court stated, perhaps DCS could have done more to assist these parents. But DCS could not prevent the parents from using drugs. That goal was the parents' responsibility to accomplish. Upon careful consideration of the record as a whole, we find that DCS did make reasonable efforts to assist both parents in battling their drug addiction.

Father next contends that DCS did not make reasonable efforts to assist him with his language barrier. Specifically, Father claims that DCS failed to provide Father with a Spanish interpreter. At trial, Father testified that he had lived in the United States for "26 years" and that he was able to "function in [the United States] culture to some degree with English speaking people." However, Father explained that his "primary language" was Spanish and that he could understand "maybe 50 percent" of what was said to him in

English. Father added that due to this language barrier, he had been "very confused" during the termination proceedings and did not understand how "grave" the situation had become until "maybe three weeks" before trial. Notably, the trial court did provide a Spanish interpreter during the termination trial in accordance with Tennessee Supreme Court Rule 42 § 3 ("It is the responsibility of the court to determine whether a participant in a legal proceeding has a limited ability to understand and communicate in English. If the court determines that a participant has such limited ability, the court should appoint an interpreter[.]").

DCS acknowledges that it did not provide Father with an interpreter during the pre-trial proceedings. In its defense, DCS points out that "both Mother and Father signed the [Criteria and Procedures document]" indicating that the document had been explained to them. At trial, Father's attorney handed him a copy of the Criteria and Procedures, which bore Father's signature. Father acknowledged that the signature was his but explained that he was unable to read the document or "understand it fully" because it was written in English. When asked whether DCS had reviewed the Criteria and Procedures with the parents at the time of the Child's removal, Ms. O'Neill merely answered that the document was "in the file." There was no further testimony regarding whether DCS had reviewed or explained the Criteria and Procedures document to Mother or Father. Father also recounted that at one point, he had approached a DCS employee with a request for an interpreter but "no one ever got back" to him and that on another occasion, Father had asked his former attorney for an interpreter, but none was ever provided.

Given that parents have a fundamental, constitutional interest in the care and custody of their children, *see Keisling*, 92 S.W.3d at 378, we take very seriously Father's contention that DCS should have provided him with an interpreter so that he could fully participate in the proceedings leading up to the trial. There is no statutory or regulatory requirement in Tennessee that DCS provide an interpreter for parents who face termination of their parental rights. However, DCS has in some instances provided interpreters and Spanish-language versions of relevant documents to parents. *See, e.g.*, *In re Jose L.*, No. E2016-00517-COA-R3-PT, 2016 WL 6426774, at *2 (Tenn. Ct. App. Oct. 31, 2016) (affirming termination when a DCS interpreter had thoroughly explained the criteria and procedures for termination of parental rights and each of the permanency requirements to the father in Spanish and DCS had provided Spanish copies of each of the relevant documents to the father); *In re D.P.M.*, No. M2005-02183-COA-R3PT, 2006 WL 2589938, at *2 (Tenn. Ct. App. Sept. 8, 2006) (affirming termination when DCS had employed an interpreter to read the permanency plans to the mother in Spanish and explain them). These examples notwithstanding, this Court has not directly addressed the issue of whether DCS should provide an interpreter to parents of limited English-speaking ability as part of the department's "reasonable efforts to assist" in a termination proceeding.

Although we find no authority requiring DCS to provide an interpreter, this Court has emphasized the importance of providing an interpreter "at all stages" of a termination

proceeding. *See In re Valle*, 31 S.W.3d 566, 570, 573 (Tenn. Ct. App. 2000) (considering whether "due process requires that a translator be provided a non-English speaking parent in a termination of parental rights case" and reversing the trial court's termination of the parental rights in part because the court failed to do so). In *In re Valle*, we determined:

> While we have found no case dealing with the precise issue before us, we generally recognize that the party litigant is entitled to be present in all stages of the actual trial of the case. *Warren v. Warren*, 731 S.W.2d 908, 909 (Tenn. Ct. App. 1985). Thus, a party must be in a position to understand the nature of the case and the testimony of the witnesses. When this question presents itself, the trial court must determine whether an interpreter is necessary, based upon the nature and extent of any alleged disability of the parties. Considering the drastic nature of a termination of parental rights case, it is particularly incumbent upon the trial court to be careful in exercising discretion for the appointment of an interpreter.

31 S.W.3d at 573 (emphasis added).

We recognize that *In re Valle* dealt with the question of whether the trial court, not DCS, violated the parent's constitutional rights by failing to provide an interpreter. *See id.* However, in cases when a child has been removed into DCS custody, a parent's understanding of the nature of the case necessarily involves a parent's understanding of DCS's criteria and procedures for termination. As Father asserts, DCS's reasonable efforts prior to a parental termination trial are often "intertwined" with a parent's success in avoiding termination of his or her parental rights. *See In re Kaliyah S.*, 455 S.W.3d at 556. This is particularly so in a case such as the instant action wherein the Child had been placed into DCS custody, DCS had initiated the Termination Petition, and DCS had maintained a pivotal role in assisting the parents in completing the requirements set forth in the permanency plans.

Upon reviewing the facts before us, we find that the better practice for DCS would have been for the department to provide Father with a Spanish interpreter for the specific purpose of (1) explaining the general criteria and procedures for termination of parental rights (including an explanation of the Criteria and Procedures document) and (2) explaining to Father what was expected of him to avoid termination of his parental rights. Also, a better practice would have been to provide a written, Spanish version of the Criteria and Procedures document and the permanency plans to Father so that Father could review those critical documents in his native language.

We do not intend to suggest that DCS should have provided Father with an interpreter for every check-in, meeting, supervised visitation, service, or class. Such a requirement would be impractical, if not impossible, considering that many of the services and referrals provided by DCS are facilitated by third-party organizations over which DCS

has no direct control. We are also mindful that Father was represented by counsel during every stage of the termination proceedings, such that Father's attorney could have asked for an interpreter for Father during DCS meetings. However, in our estimation, it would have been reasonable for DCS to provide Father with an interpreter, at the minimum, to translate for Father the Criteria and Procedures document and to interpret the requirements expected of Father pursuant to the permanency plans. Had DCS provided Father a Spanish interpreter for these discrete purposes, Father would have been better placed "in a position to understand the nature of the case" against him. *See In re Valle*, 31 S.W.3d at 573.

Cognizant of the due process and constitutional implications that are inherent to a parental termination action, we conclude that by failing to provide Father with a Spanish interpreter to (1) explain to Father the Criteria and Procedures document and (2) explain to Father what was expected of him to regain custody of the Child, including the requirements laid out in the permanency plans, DCS fell short of its responsibility to make reasonable efforts to assist Father in making lasting adjustments toward reunification with the Child. Accordingly, we conclude that factor (L) weighs against termination of Father's parental rights.

However, we reiterate that the reasonableness of DCS's efforts is but one factor to be considered among twenty factors in the best interest analysis. *See In re Kaliyah S.*, 455 S.W.3d at 555. Furthermore, when reasonable efforts are being evaluated, the "child's health and safety" is of "paramount concern." *See* Tenn. Code Ann. § 37-1-166(g). Regardless of any deficiency on the part of DCS, Mother and Father continued to test positive for methamphetamine after the Child was removed from their care. Thus, the parents demonstrated an inability to eradicate drugs from their home, and this fact proved fatal to their case. Considering the totality of the best interest factors, we determine that the evidence preponderates in favor of the trial court's conclusion, by clear and convincing evidence, that termination of Mother's and Father's parental rights was in the Child's best interest.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's judgment in all respects, including termination of Mother's and Father's parental rights. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Mother's and Father's parental rights to the Child and for collection of costs assessed below. Costs on appeal are assessed one-half to the appellant, Angela M.C., and one-half to the appellant, Hector M.C.

s/Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE